995 P.2d 33 (2000)
140 Wash.2d 143
OPEN DOOR BAPTIST CHURCH, Reverend Rocky Shanks, and Radine Shanks, Petitioners,
v.
CLARK COUNTY, a municipal subdivision of the State of Washington; Code Enforcement Division of the Department of Public Services of Clark County; and Larry Epstein, in his official capacity as Clark County Hearings Examiner, Respondents.
No. 67075-7.
Supreme Court of Washington, En Banc.
Argued May 13, 1999.
Decided March 16, 2000.
*34 Donald Esau, Vancouver, for Petitioners.
Arthur Curtis, Clark County Prosecutor, Christopher Horne, Deputy, Vancouver, for Respondents.
ALEXANDER, J.
Clark County issued a notice and order to the Open Door Baptist Church (Open Door), based on the County's determination that Open Door's church site did not conform with the County's zoning code. The order required Open Door to either cease its business activities or apply for a conditional use permit. Open Door appealed the determination *35 to the Clark County hearing examiner. The hearing examiner affirmed the notice and order. Open Door then obtained review by a writ of certiorari to the Clark County Superior Court. After a hearing, the superior court vacated the hearing examiner's ruling based upon its finding that the County's action would constitute a burden on Open Door's free exercise of religion. The County appealed that decision to the Court of Appeals, arguing that Open Door had failed to demonstrate that applying for a permit would burden its free exercise of religion. Although the Court of Appeals reversed the trial court on this question, it affirmed its decision allowing the County to adjust the permit application fee if Open Door could show that it was unable to pay the fee. Open Door sought discretionary review in this court and we granted it. We affirm the Court of Appeals.

FACTS
Open Door has used the Clark County property at issue here as a church since 1990. The building, which is located on the property, had originally been devoted to church purposes, but had been used as an art school from 1978 until first occupied by Open Door. There is no dispute over the fact that this property lies within the County's rural estate zoning district.
On January 12, 1995, Open Door's pastor, Rocky Shanks, was served with a notice and order from Clark County which gave notice of the following violation: "No Conditional Use Permit for church in Rural Estate (RE) Zoning District as per Clark County Code 18.304." Clerk's Papers (CP) at 42. Open Door was ordered "to cease all business activities or apply for a conditional use permit within ten (10) days from the date of this notice and order." CP at 42 (emphasis added). Open Door appealed to the Clark County hearing examiner, arguing that the notice and order was "against the Constitution of the Great State of Washington and the United States Constitution which is the Supreme Law of the Land." CP at 33.
In March 1995, a hearing was held by the hearing examiner at which witnesses testified both for and against the notice and order. The previous owner testified about a meeting that she had attended with Shanks and a Realtor in which the Realtor advised Shanks that "the building was not approved as a church, and that the County needed to issue a conditional use permit to use it as a church." CP at 62. The hearing examiner concluded that he did "not have jurisdiction to consider state or federal constitutional issues or federal statutory issues," and could base his decision only on applicable land use laws. CP at 62. He found that the property was being used as a church without the necessary conditional use permit, and that the use of the property as a church was not a nonconforming use "because the right to use the Property for a church as a nonconforming use expired when the Property was not used as a church from 1978 to 1990." CP at 63 (emphasis added). Accordingly, the examiner affirmed the notice and order, finding that "sixty (60) calendar days ... is a reasonable time in which to file a technically complete application for a conditional use permit, because the Appellants [Open Door] already have participated in a pre-application conference." CP at 63. The examiner ordered that in the event that Open Door failed to file an application by the 60-day deadline, Open Door's use of the property as a church should cease and, should it continue, a daily fine of $50 would be imposed.[1]
Open Door obtained review of the examiner's decision through a writ of certiorari to the Clark County Superior Court, alleging that enforcement of the zoning regulations violated its federal and state constitutional rights to free exercise of religion. In April 1996, following oral argument, the superior court judge vacated the hearing examiner's order, stating that "Clark County and the Code Enforcement Division of Clark County failed to observe the appropriate legal standards under Sumner v. First Baptist *36 Church."[2] CP at 181. The trial court found that "[w]hat is lacking from the county's presentation ... is a showing that less restrictive alternatives to a full blown conditional use permit with site plan review were considered." CP at 181. It held that were the County "to seek further enforcement in this action," it would "bear the burden of complying with the Sumner standard, and, in the event that there ensues an appeal to a hearings examiner, bear the burden of proving such compliance." CP at 181. Accordingly, the trial court found that the County would have "to justify its regulations by demonstrating a compelling state interest and that it has chosen the least-restrictive alternative to accomplish that result." CP at 184. Moreover, the trial court held that "the necessity of charging the Church the customary fees and costs associated with a conditional use permit, variance or any other application must also be assessed by the County under the same compelling state interest/least-restrictive alternative test." CP at 184.
The parties later stipulated "that the cost of land use permits ... is not an issue. The permit process is the issue. Therefore, to the extent that the church has alleged that cost is an issue, Plaintiffs abandon that position."[3] CP at 349 (emphasis added). Open Door then moved for summary judgment, in an effort to obtain monetary damages allegedly caused by "prior enforcement activities of the county." CP at 351. It asserted that the County had violated "the U.S. Constitution  Freedom of Exercise clause; the "Washington State Constitution Freedom of Religion clause; and the Religious Freedom Restoration Act of 1993." CP at 350. The trial court partially granted Open Door's motion "on the issue of whether or not the proposed shut-down of plaintiffs' church ... would constitute a burden on plaintiffs' free exercise of religion, under the religious freedom provision of Section 1 of the Washington State constitution and under the Religious Freedom Restoration Act." CP at 354 (emphasis added). It denied summary judgment, however, on "the issue of plaintiffs' entitlement to monetary damages" finding no evidence of "any monetary damages," a finding premised upon the fact that Open Door had not even applied for a conditional use permit. CP at 358. The trial court subsequently withdrew the grant of partial summary judgment in light of City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), wherein the United States Supreme Court struck down the Religious Freedom Restoration Act of 1993.
The County appealed the trial court's ruling vacating the hearing examiner's order. In an unpublished opinion, a panel of the Court of Appeals, Division Two, reversed the trial court on the question of whether applying for a permit would infringe upon Open Door's free exercise of religion. It held that the mere process of applying for a permit did not impose an unconstitutional burden, although it wrote that "[n]othing in this decision will affect Open Door's right to challenge the denial of the conditional use permit" should such a denial occur. Open Door Baptist Church v. Clark County, No. 22285-0-II, slip op. at 6, 91 Wash.App. 1037, 1998 WL 341968 (Wash.Ct.App. June 26, 1998) (emphasis added). It further concluded that if Open Door should first demonstrate its inability to pay the application fee, the burden would shift "to the County to demonstrate a compelling purpose for charging the fees." Open Door Baptist Church, No. 22285-0-II, slip op. at 7-8. Thus, it concluded, "the County must ensure that its fees do not burden Open Door's worship." Open Door Baptist Church, No. 22285-0-II, slip op. at 8.
We granted review upon Open Door's petition for review.

ANALYSIS
The broad question that we are presented with here is whether the County's order requiring Open Door to apply for a conditional use permit, and pay the attendant fees, unconstitutionally burdens the church's religious *37 freedom guaranteed by article I, section 11 of the Washington Constitution. In light of the dissent in this case, we emphasize that we are not confronted in this case with the denial of a conditional use permit application, the anticipation of which animates the dissent. Rather, the case presents the question of whether a church must merely alert citizens and their government through the conditional use application process  to its intention to locate in those zoned areas where churches, as is equally true of other uses, are not allowed as of right but are allowed to apply for conditional use status.
Under chapter 18.303A.030 of the Clark County Code, churches are among the conditional uses listed for rural districts. Conditional uses are uses that "may be permitted, subject to the granting of a conditional use permit." CLARK COUNTY CODE (CCC) 18.404.010. The purpose of the rural district, formerly known as the "rural estate" district, is defined as follows: "[T]o provide lands for residential living in the rural area. Natural resource activities such as farming and forestry are allowed and encouraged in conjunction with the residential uses in the area. These areas are subject to normal and accepted forestry and fanning [sic] practices." CCC 18.303A.010. There is no reasonable dispute over the fact that this zoning is facially neutral with respect to churches.[4] We have previously held that "[i]t is well established that zoning ordinances are constitutional in principle as a valid exercise of the police power." State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. City of Wenatchee, 50 Wash.2d 378, 381, 312 P.2d 195 (1957) (citing State ex rel. Miller v. Cain, 40 Wash.2d 216, 242 P.2d 505 (1952); Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016 (1926)). Moreover, "[g]overnments may impose regulatory fees under their general police powers." Covell v. City of Seattle, 127 Wash.2d 874, 878, 905 P.2d 324 (1995) (citing Margola Assocs. v. City of Seattle, 121 Wash.2d 625, 634-35, 854 P.2d 23 (1993); Wash. Const. art. XI, § 11)).
Nonconforming uses are disfavored under the law. See Christianson v. Snohomish Health Dist., 133 Wash.2d 647, 663, 946 P.2d 768 (1997); Anderson v. Island County, 81 Wash.2d 312, 323, 501 P.2d 594 (1972) (citing M.A. Leffingwell, Annotation, Zoning: Changes, After Adoption of Zoning Regulations, in Respect of Nonconforming Existing Use, 147 A.L.R. 167, 168 (1943)). "The policy of zoning legislation is to phase out a nonconforming use." Anderson, 81 Wash.2d at 323, 501 P.2d 594 (citing Bartz v. Board of Adjustment, 80 Wash.2d 209, 492 P.2d 1374 (1972); State ex rel. Smilanich v. McCollum, 62 Wash.2d 602, 384 P.2d 358 (1963)). Where a nonconforming use is in existence at the time that a zoning ordinance is enacted, and thus allowed to continue, it "`cannot be changed into some other kind of a nonconforming use.'" Coleman v. City of Walla Walla, 44 Wash.2d 296, 300, 266 P.2d 1034 (1954) (quoting approvingly 8 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25.202, at 389 (3d ed.1949)). Thus, even though the property in question in this case was originally used as a church, it had been an art school for 12 years prior to Open Door's purchase of it in 1990. Whatever original nonconforming use status it may *38 have once enjoyed could not be passed along to Open Door.[5]

Const. art. I, § 11
Const. art. I, § 11 parallels the First Amendment's religious Establishment and Free Exercise Clauses. At the threshold we note that determining whether the Washington Constitution provides broader rights than the United States Constitution generally proceeds only upon application by parties of the six nonexclusive factors laid out in State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).[6] We have written within the context of a seminal article I, section 11 case that "[i]f a party does not provide constitutional analysis based upon the factors set out in Gunwall, the court will not analyze the state constitutional grounds in a case." First Covenant Church v. City of Seattle, 120 Wash.2d 203, 224, 840 P.2d 174 (1992) (First Covenant II) (citing Clark v. Pacificorp, 116 Wash.2d 804, 829, 809 P.2d 176, superseded by 118 Wash.2d 167, 822 P.2d 162 (1991)); see also State v. Motherwell, 114 Wash.2d 353, 368-69, 788 P.2d 1066 (1990) (declining to reach claim under Const. art. I, § 11 where Gunwall factors not analyzed). In this case, Open Door has not referred to Gunwall in any of its briefs, nor has it made any analysis distinguishing Const. art. I, § 11 from the First Amendment. However, because we are reviewing decisions by the trial court and the Court of Appeals that relied upon Const. art. I, § 11 analyses, we will assess this case in light of Const. art. I, § 11,[7] which we have determined "absolutely protects the free exercise of religion, extends broader protection than the first amendment to the federal constitution." First Covenant II, 120 Wash.2d at 229-30, 840 P.2d 174 (emphasis added).
We have previously stated that "[t]he first prerequisite for any free exercise challenge is that the parties have a sincere religious belief." Munns v. Martin, 131 Wash.2d 192, 199, 930 P.2d 318 (1997). The County does not argue that Open Door is not the embodiment of a sincere religious belief.
We have also noted that "[t]he second question for analysis is whether the challenged enactment or action constitutes a burden on the free exercise of religion." Munns, 131 Wash.2d at 200, 930 P.2d 318. In assessing the right to religious freedom in this state, we have said:
Article 1, section 11 of the state constitution absolutely protects "freedom of conscience in all matters of religious sentiment, belief, and worship" and guarantees that "no one shall be molested or disturbed in person or property on account of religion." This constitutional guaranty of free exercise is "of vital importance." Bolling [v. Superior Court], 16 Wash.2d [373] at 381, 133 P.2d 803 [(1943)]. If the "coercive effect of [an] enactment" operates against a party "in the practice of his religion", it unduly burdens the free exercise *39 of religion. Witters v. Comm'n for the Blind, 112 Wash.2d 363, 371, 771 P.2d 1119, cert. denied, 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989); [City of] Sumner [v. First Baptist Church], 97 Wash.2d [1] at 5, 639 P.2d 1358 [(1982)]. A facially neutral, even-handedly enforced statute that does not directly burden free exercise may, nonetheless, violate article 1, section 11, if it indirectly burdens the exercise of religion. Sumner, at 7-8, 639 P.2d 1358; Bolling, at 385-86, 133 P.2d 803.
Munns, 131 Wash.2d at 200, 930 P.2d 318 (quoting First Covenant II, 120 Wash.2d at 226, 840 P.2d 174) (some alterations in original). We have indicated that "if an enactment does create a burden, the courts must analyze if the burden is offset by a compelling state interest." Munns, 131 Wash.2d at 200, 930 P.2d 318.
The trial court and Open Door have placed great weight upon our opinion in City of Sumner v. First Baptist Church, 97 Wash.2d 1, 639 P.2d 1358 (1982), which the County contends is a holding based entirely upon the First Amendment. It is true that Sumner, despite a passing mention at its outset of a Const. art. I, § 11 claim, is a holding based exclusively upon a First Amendment analysis using opinions from the United States Supreme Court and courts from other states. See, e.g., Sumner, 97 Wash.2d at 10, 639 P.2d 1358 (remanding and writing that "[t]he trial court should consider the practical effect uncompromising enforcement of the City's building code and zoning ordinance will have on appellants' First Amendment rights." (emphasis added)).
Sumner predated the Gunwall decision in which we adopted the analytical framework for conducting independent state constitutional analysis. However, we have subsequently cited Sumner to illustrate principles under Const. art. I, § 11. See First Covenant II, 120 Wash.2d at 226-27, 840 P.2d 174. Thus, it is also a decision supportable under Const. art. I, § 11  an important fact given that its First Amendment analysis, under the compelling interest test of Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), is no longer viable. See Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).
In Sumner, the City of Sumner found violations of its building code by a church operated school, and the trial court "enjoined use of the building for school purposes until such time as it is brought into compliance with the code." Sumner, 97 Wash.2d at 4, 639 P.2d 1358. Sumner relied upon language from a United States Supreme Court opinion:
"[A]ny incidental burden on the free exercise of appellant's religion may be justified [only] by a `compelling state interest in the regulation of a subject within the State's constitutional power ...'" (Italics ours). Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The fundamental tenet involved need not be directly impacted for the regulation to be constitutionally infirm.
Sumner, 97 Wash.2d at 7-8, 639 P.2d 1358 (alterations in original).
Under our use of the Sherbert test, after the complaining party first establishes that a governmental action has a coercive effect upon the practice of religion,[8] the State must identify "whether the means chosen to enforce the governmental interest were necessary and the least restrictive available to achieve the ends sought." Sumner, 97 Wash.2d at 8, 639 P.2d 1358 (citing Sherbert, 374 U.S. at 407, 83 S.Ct. 1790; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)). In Sumner, four justices found that "it cannot be determined whether the City used the least restrictive means of achieving its compelling interest." Sumner, 97 Wash.2d at 9, 639 P.2d 1358. Justice Utter concurred in the views expressed by these justices. See Sumner, 97 Wash.2d at 14-15, 639 P.2d 1358 (Utter, J., concurring). While a majority supported the result of dissolving the injunction and remanding to the trial court for full consideration of the church's First Amendment claims, they did so for *40 different reasons. See, e.g., Sumner, 97 Wash.2d at 15, 639 P.2d 1358 (Williams, J., concurring) ("I would not ... impose the rigorous standards suggested by the majority in areas such as this which do not directly impact the right to freely practice one's religion.").
The County points out that in Sumner, unlike here, the subject church had been lawfully located in a residential section of Sumner for a continual 75 years. However, the Uniform Building Code, which allowed for "grandfathered" nonconforming uses that were legal and existing at the time of its enactment, was only adopted by the City of Sumner in 1974. See Sumner, 97 Wash.2d at 11, 639 P.2d 1358. The question, therefore, was whether the church's use of its property for school purposes was a permissible, nonconforming use under these terms of the City of Sumner's building code and the similar language of its zoning code, which also allowed for the "continuation of nonconforming uses existing at the time the zoning ordinance was adopted." Sumner, 97 Wash.2d at 13, 639 P.2d 1358. Relevant to this case was the fact that Sumner remanded the resolution of this question to the trial court, and we noted, without a hint of opprobrium, that "zoning would preclude church use of this property as a school, or even as a church, if an exception did not apply." Sumner, 97 Wash.2d at 13, 639 P.2d 1358.
Thus, Sumner does not support Open Door's position in this case, where Open Door seeks to avoid even applying for a permit that would allow an otherwise disallowed use. Moreover, the Court of Appeals' opinion in this case, quite unlike the injunction complained of in Sumner, allows Open Door to continue its operation pending resolution of its conditional use permit application. "In Sumner, First Baptist Church applied for a permit for its church school and was denied because of technical violations having no effect on public safety.... In this case, however, Open Door did not apply for a permit and has not been denied."[9]Open Door Baptist Church, No. 22285-0-II, slip op. at 5 (emphasis added). The Court of Appeals went on to note that "Clark County cannot accommodate Open Door and balance those zoning requirements that do affect public safety and health with Open Door's religious practice if Open Door may simply ignore the zoning requirements altogether by failing to apply for a permit." Open Door Baptist Church, No. 22285-0-II, slip op. at 5. The Court of Appeals correctly concluded that the County has not run afoul of our decision in Sumner.
This decade has seen a trilogy of cases involving Const. art. I, § 11 challenges concerning the imposition of municipal historic preservation ordinances upon churches. See Munns, 131 Wash.2d 192, 930 P.2d 318; First United Methodist Church, 129 Wash.2d 238, 916 P.2d 374; First Covenant Church v. City of Seattle, 114 Wash.2d 392, 787 P.2d 1352 (1990) (First Covenant I), vacated and remanded, 499 U.S. 901, 111 S.Ct. 1097, 113 L.Ed.2d 208 (1991), judgment reinstated, First Covenant II, 120 Wash.2d 203, 840 P.2d 174. First Covenant I involved the application of the City of Seattle's Landmarks Preservation Ordinance to a church. In First Covenant II we noted that such "[p]reservation ordinances further cultural and aesthetic interests, but they do not protect public health or safety." First Covenant II, 120 Wash.2d at 222, 840 P.2d 174 (citing Society of Jesus v. Boston Landmarks Comm'n, 409 Mass. 38, 564 N.E.2d 571, 573 (1990); Church of St. Paul & St. Andrew v. Barwick, 67 N.Y.2d 510, 496 N.E.2d 183, 202, 505 N.Y.S.2d 24 (1986) (Meyer, J., dissenting)). We found that the effect of Seattle's ordinances was to "burden First Covenant financially, because they reduce the value of the church's property by almost half." First Covenant II, 120 Wash.2d at 219, 840 P.2d 174 (emphasis added). We held that under both the state and federal constitutions "[t]he City's interest in preservation of aesthetic and historic structures is not compelling and it does not justify the infringement of First Covenant's right to freely exercise religion. *41 The possible loss of significant architectural elements is a price we must accept to guarantee the paramount right of religious freedom." First Covenant II, 120 Wash.2d at 223, 840 P.2d 174.
The same City of Seattle Landmarks Preservation Ordinance, under similar facts, was at issue in both First Covenant and First United Methodist Church. In First United Methodist Church, the financial burden was similarly onerous. There we wrote that "[w]hile not all financial burdens have a coercive effect ..., gross financial burdens violate the right to free exercise." First United Methodist Church, 129 Wash.2d at 249, 916 P.2d 374 (citing First Covenant II, 120 Wash.2d at 219, 840 P.2d 174). The financial burden complained of there was the fact that "[l]andmark nomination ... has prevented United Methodist from either remodeling its sanctuary or selling the church property." First United Methodist Church, 129 Wash.2d at 244-45, 916 P.2d 374. Again, that burden was being imposed simply for aesthetic and cultural reasons, and, "[a]s a result of First Covenant I, landmark designation will be found unconstitutional once a religious institution demonstrates a burden on free exercise." First United Methodist Church, 129 Wash.2d at 247, 916 P.2d 374.
Normally, with regard to potential harm, we would say that "[a] decision at this time would be advisory only. Although courts in some states do render advisory opinions, we do not do so in this jurisdiction." Walker v. Munro, 124 Wash.2d 402, 414, 879 P.2d 920 (1994) (citing Washington Beauty College, Inc. v. Huse, 195 Wash. 160, 164, 80 P.2d 403 (1938)). In other words, "this court will not render judgment on a hypothetical or speculative controversy." Walker, 124 Wash.2d at 415, 879 P.2d 920. However, Open Door refers us to language in Munns[10] that suggests another rule in article I, section 11 cases: "In our cases, the potential burden of an ordinance creates constitutional infirmity." Munns, 131 Wash.2d at 207, 930 P.2d 318.
Munns involved the application of a City of Walla Walla demolition ordinance that provided for a waiting period where demolition was sought for "any structure over 50 years old, or `places of historic value.'" Munns, 131 Wash.2d at 202, 930 P.2d 318 (quoting Walla Walla Municipal Code 20.146.040). The actual delay ordered in Munns upon application by the Roman Catholic Church to demolish a parochial school was 70 days, but we found that "the potential of an additional 12 months of delay under the Walla Walla ordinance is an administrative burden." Munns, 131 Wash.2d at 207, 930 P.2d 318. To illustrate the breadth of this rule, we cited the fact that "[t]he mere nomination of a building for historic status was sufficient in First United Methodist to constitute an administrative burden." Munns, 131 Wash.2d at 207, 930 P.2d 318. We noted that Justice Dolliver in his First United Methodist Church dissent had decried "the theoretical nature of the administrative burden" of the Seattle ordinance challenged there. Munns, 131 Wash.2d at 207, 930 P.2d 318 (citing First United Methodist Church, 129 Wash.2d at 253, 916 P.2d 374 (Dolliver, J., dissenting)).
However, our citation to Justice Dolliver's dissent in Munns was not to suggest that it was the law of First United Methodist Church. The majority in that case, after all, found that "[u]nder the Landmarks Preservation Ordinance, nomination alone carries with it severe restrictions." First United Methodist Church, 129 Wash.2d at 244, 916 P.2d 374 (emphasis added). Chief among the actual, and not just "theoretical," restrictions identified was the fact that even nomination for landmark designation "impedes United Methodist from selling its property and using the proceeds to advance its religious mission." First United Methodist Church, 129 Wash.2d at 252, 916 P.2d 374. Moreover, to the extent that the justiciability bar has been lowered in article I, section 11 cases with regard to potential harm, it has been lowered only in a fact-specific context  where an imposition is placed upon a church's free *42 exercise of religion entirely for cultural or aesthetic (e.g., historic landmark designation), and not compelling, reasons. Munns is thus distinguishable. Indeed, counsel for the City of Walla Walla conceded in that case that no "compelling state interest" for the challenged ordinance existed. Munns, 131 Wash.2d at 209, 930 P.2d 318. Similarly, in First United Methodist Church, after we had found no compelling interest in landmark preservation under the same ordinance in First Covenant II, the City of Seattle conceded that it had no compelling interest in landmark preservation. See First United Methodist Church, 129 Wash.2d at 250, 916 P.2d 374. No such finding or concession guides our analysis in this case.
In the present case, the potential harm would seem to be too attenuated from the process of which Open Door complains. What is the "burden on the free exercise of religion" that Open Door has identified? Munns, 131 Wash.2d at 200, 930 P.2d 318. It speculates, based upon the testimony before the hearing examiner of a county official, without more, that a conditional use permit would probably not be granted. It writes that "the Church is being coerced into ceasing its mission and meeting for corporate worship because it fails to have a conditional use permit. The burden, therefore, is clear." Resp'ts' Br. at 11. Actually, this burden is quite un clear. The peril that Open Door predicts will come to pass is just a prediction. With regard to this claim, the County is wholly correct that Open Door must still exhaust its administrative remedies. See First Covenant I, 114 Wash.2d at 400, 787 P.2d 1352 ("The Church has exhausted its administrative remedies and the only forum now available for appeal is the judicial system." (emphasis added)).
Open Door makes the additional argument that "[i]f there is no compelling interest in a government restricting a church in its ability to alter a church body, there must be no compelling interest in restricting a church from existing in the first place." Resp'ts' Br. at 20-21. This is an overbroad statement, though, of both of our holdings and of what is at stake in this case. We did not say, for example, in Munns that the Roman Catholic Church was somehow free to destroy its parochial school without obtaining any demolition permit, but instead held that the conceded absence of a compelling state interest meant that there was no support for burdening religious free exercise through the delay in the issuance of a permit for aesthetic reasons alone. Indeed, Munns expressly did not pass upon any of the "traditional physical environmental factors such as air, water, traffic, or the like" that are attendant to a zoning decision. Munns, 131 Wash.2d at 209 n. 5, 930 P.2d 318. As the Court of Appeals in this case noted, unlike the situation in Munns, here "[t]here is no waiting period imposed in the Clark County Code and, if the County approved the permit, then Open Door's right to meet and worship on the property will not have been abridged." Open Door Baptist Church, No. 22285-0-II, slip op. at 6. Under the decision of the Court of Appeals, Open Door is allowed to continue its operations unimpeded pending resolution of its conditional use permit application, given that the County failed to demonstrate a compelling state interest that would be offended by such interim operation.[11]See Munns, 131 Wash.2d at 200, 930 P.2d 318. Thus, Munns is simply inapposite.
Open Door also argued before the Court of Appeals that the cost of compliance, an estimated $5,523 to apply for the conditional use permit, is a financial burden. Open Door cannot renew this complaint in light of the Court of Appeals resolution of this issue,[12] *43 requiring the County to reduce or waive the fee following a showing of an inability to pay by Open Door,[13] and thus its circumstances are distinguishable from the financial burdens identified in First Covenant II and First United Methodist Church. Without this component, however, Open Door's "burden" argument upon petition for review is a bit threadbare and based upon little more than the inconvenience of filling out paperwork. It is left to make overbroad assertions that, perhaps unintentionally, reveal the implications of what a holding in its favor would signify: "Absent a valid state interest in reasonable health, fire and safety standards, there is no compelling reason to require a church to make application for a conditional use permit." Pet. for Review at 8. Most succinctly this reduces to "[a]bsent a health, fire and safety standard, there is no compelling reason to regulate where a church should be located." Pet. for Review at 8. In practical effect, Open Door and the dissenters to this opinion are inviting us to find that zoning restrictions do not apply to churches, despite the fact that we "simply do not possess the power to amend zoning ordinances or to rezone a zoned area, and ... cannot and should not invade the legislative arena or intrude upon municipal zoning determinations, absent a clear showing of arbitrary, unreasonable, irrational or unlawful zoning action or inaction." Bishop v. Town of Houghton, 69 Wash.2d 786, 792-93, 420 P.2d 368 (1966) (emphasis added) (citing State ex rel. Gunning v. Odell, 58 Wash.2d 275, 362 P.2d 254 (1961); McNaughton v. Boeing, 68 Wash.2d 659, 414 P.2d 778 (1966)).

First Amendment
As we have done in all other Const. art. I, § 11 cases, we can also look to the reasoning of opinions construing the Free Exercise Clause of the First Amendment for persuasive guidance. Those cases can be looked upon as constituting a floor of protections below which we cannot descend, but they do not limit our ability to build upon them in construing our own constitution's more expansive guarantee of religious free exercise.[14]
The United States Supreme Court has placed limitations upon the use of the Sherbert test in First Amendment cases:
We have never invalidated any governmental action on the basis of the Sherbert test except the denial of unemployment compensation. Although we have sometimes purported to apply the Sherbert test in contexts other than that, we have always found the test satisfied. In recent years we have abstained from applying the Sherbert test (outside the unemployment compensation field) at all.
Smith, 494 U.S. at 883, 110 S.Ct. 1595 (citations omitted). "The application of the Sherbert test, the Smith decision explained, would have produced an anomaly in the law, a constitutional right to ignore neutral laws of general applicability." City of Boerne, 521 U.S. at 513, 117 S.Ct. 2157. Accordingly, "Smith held that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." City of Boerne, 521 U.S. at 514, 117 S.Ct. 2157. As the Court noted in Smith: "[T]o say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts." Smith, 494 U.S. at 890, 110 S.Ct. 1595. The Court warned against "a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws *44 against the centrality of all religious beliefs." Smith, 494 U.S. at 890, 110 S.Ct. 1595.
Congress subsequently attempted to overrule Smith by passing the Religious Freedom Restoration Act of 1993 (RFRA), the stated purpose of which was "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." City of Boerne, 521 U.S. at 515, 117 S.Ct. 2157 (emphasis added) (quoting 42 U.S.C. § 2000bb(b)(1)). The United States Supreme Court struck this act down on the basis that it was beyond the power of Congress to enact. See City of Boerne, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624. The facts there were that the City of Boerne, Texas, had denied a church's permit application in which the church sought to enlarge its church. In not issuing the permit, the city had relied upon a preservation "ordinance and the designation of a historic district (which, they argued, included the church)." City of Boerne, 521 U.S. at 512, 117 S.Ct. 2157. The church alleged that this violated the RFRA. However, the United States Supreme Court found this act to be unconstitutional, and used language directly relevant to this case in doing so:
It is a reality of the modern regulatory state that numerous state laws, such as the zoning regulations at issue here, impose a substantial burden on a large class of individuals. When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs.
City of Boerne, 521 U.S. at 535, 117 S.Ct. 2157. Moreover, the Court further conveyed its disapproval of misuse of the Sherbert test, noting that the "least restrictive means requirement... was not used in the pre-Smith jurisprudence RFRA purported to codify." City of Boerne, 521 U.S. at 535, 117 S.Ct. 2157 (emphasis added). In striking down the RFRA it noted that Congress could not defy "a judicial interpretation of the Constitution already issued." City of Boerne, 521 U.S. at 536, 117 S.Ct. 2157.
Prior to Boerne, the United States Supreme Court had already vacated and remanded, in light of its holding in Smith, an opinion of this court that had relied heavily upon Sherbert in holding unconstitutional the application of a Seattle landmark ordinance to a church. See First Covenant I, 114 Wash.2d 392, 787 P.2d 1352. Upon remand, we conceded that the rule of Smith "applies in both civil and criminal cases and may apply in this case if the City's preservation ordinances are neutral and generally applicable." First Covenant II, 120 Wash.2d at 213, 840 P.2d 174. We were able to distinguish Smith, though, because Smith "is a police power case and this case is not." First Covenant II, 120 Wash.2d at 218, 840 P.2d 174. Accordingly, in First Covenant II we returned to our prior use of the Sherbert test and applied it to the facts before us. However, Sumner, it should be noted, was a police power case involving "the police power of the City of Sumner." Sumner, 97 Wash.2d at 5, 639 P.2d 1358. Thus the First Amendment underpinnings of that decision are untenable.
Opinions from those courts charged with the everyday application of First Amendment law, the federal circuit courts of appeals, are instructive and demonstrate that the County's action here would pass muster. The Ninth Circuit Court of Appeals has upheld the denial of a conditional use permit where an attempt was made to establish a church in a residential neighborhood. See Christian Gospel Church, Inc. v. City & County of San Francisco, 896 F.2d 1221 (9th Cir.1990). The Ninth Circuit wrote that "[t]he burdens imposed by this action are ... of convenience and expense, requiring appellant to find another home or another forum for worship. We find that the burden on religious practice in this zoning scheme is minimal." Christian Gospel Church, 896 F.2d at 1224. In contrast, "[a] zoning system `protects the zones' inhabitants from problems of traffic, noise and litter, avoids spot zoning, and preserves a coherent land use zoning plan.'" Christian Gospel Church, 896 F.2d at 1224 (quoting Grosz v. City of Miami Beach, Fla., 721 F.2d 729, 738 (11th Cir.1983)). The Ninth *45 Circuit wrote that "[t]hese concerns are particularly strong in this case since the Church is applying for nonresidential use in a residential neighborhood. San Francisco has a strong interest in the maintenance of the integrity of its zoning scheme and the protection of its residential neighborhoods." Christian Gospel Church, 896 F.2d at 1224 (citing City of Memphis v. Greene, 451 U.S. 100, 127, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981); Village of Belle Terre v. Boraas, 416 U.S. 1, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974)). Accordingly, "the burden on religious practice... does not warrant an exemption from the zoning scheme." Christian Gospel Church, 896 F.2d at 1225.
The Tenth Circuit Court of Appeals has upheld the denial of a special-use permit where a permit was sought to build a church building on property belonging to the church in an area zoned for agricultural use. See Messiah Baptist Church v. County of Jefferson, Colo., 859 F.2d 820 (10th Cir.1988). Similar to our case, churches were expressly among the exceptions to a county's zoning regulation allowed by special-use permit. The Tenth Circuit held that "[r]egulation of the location of church construction is not an impediment to religious observance in the sense of a prohibition," for the church was still free to worship  even though, "[a]rguably, the zoning regulations affect secular activity and make the practice of religion more expensive, and therefore impose an indirect burden on the exercise of religion." Messiah Baptist Church, 859 F.2d at 825. This case predated Smith, so the court even applied the Sherbert test in upholding the county's permit denial by
consider[ing] whether an alternative means exists whereby the County may accomplish its purpose by means which do not impose an indirect burden. Without question, the zoning district plan, one of true differentiation and upheld as sound under ... due process analysis, cannot be implemented effectively without the resulting financial burden on the Church.
Messiah Baptist Church, 859 F.2d at 825. The Tenth Circuit concluded that, "[i]n short, there is no infringement of the Church's religious freedom. A church has no constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases." Messiah Baptist Church, 859 F.2d at 826 (citing Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).
The Sixth Circuit Court of Appeals has upheld the denial of an exception to a residential zoning ordinance where a church sought to build a church building on land that it had purchased. See Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio, 699 F.2d 303 (6th Cir. 1983). In this pre-Smith case the Sixth Circuit even applied the exacting Sherbert test in finding that "[a]t most the Congregation can claim that its freedom to worship is tangentially related to worshipping in its own structure. However, building and owning a church is a desirable accessory of worship, not a fundamental tenet of the Congregation's religious beliefs." Lakewood, 699 F.2d at 307. The court wrote that "[t]he ordinance prohibits the purely secular act of building anything other than a home in a residential district." Lakewood, 699 F.2d at 307. It made the following finding:
No pressure is placed on the Congregation to abandon its beliefs and observances. While it is true that the Congregation would face penalties if it began building on the proposed site, the penalties would not have the purpose or the effect of dissuading the Congregation from practicing its faith. In short, the burdens of the ordinance are the increased cost of purchasing land and the violation of the Congregation's aesthetic senses, if the Congregation chooses to build a new church in Lakewood.
Lakewood, 699 F.2d at 307. Accordingly, under the Sherbert test the Sixth Circuit found that "[t]he answer to the threshold question is that there is no infringement of religious freedom." Lakewood, 699 F.2d at 308 (emphasis added).
In sum, the much more significant impacts upon religious free exercise countenanced by the federal courts clearly belie the dissent's exaggerated assertion that we are endorsing "an absolute prohibition unlike any which we *46 have seen before." Dissenting op. at 49. The dissent's means of distinguishing these similar First Amendment religious free exercise cases is to ignore them. Instead the opinion resorts to quoting general statements from an inapposite First Amendment freedom of expression case, Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), and a law student's article. See Dissenting op. at 53, 55 n. 10, 38.

Discussion
Under both Const. art. I, § 11 and the First Amendment, Open Door has simply not met its threshold requirement of establishing that Clark County's actions caused anything more than an incidental burden upon the free exercise of religion. Even if it had, the County appears to be correct when it writes that "[t]here is no less restrictive alternative to requiring Open Door Baptist Church to file applications and follow the administrative process." Resp'ts' Supplemental Br. at 13. After all, "[i]f churches are not [even] subject to the application process, they will be largely exempt from zoning and other land use codes as a practical matter." Resp'ts' Supplemental Br. at 14 (emphasis added). The necessity or validity of zoning as an exercise of police power, something a bit more substantive than landmark preservation, cannot be in serious question.
The dissent writes that "Clark County attempts to zone Open Door out of existence by use of the conditional use permit process." Dissenting op. at 60. This is no more true than an assertion that the County is attempting to zone "out of existence" cemeteries, most schools, golf courses, kennels, riding stables, recreational facilities, veterinary clinics, government facilities, private ambulance dispatch facilities, or residential care homes simply because their establishment in rural districts is also contingent upon the granting of a conditional use permit. See CCC 18.303A.030. The permit requirement applies equally to these uses. This, of course, is not to say  as the dissent suggeststhat we somehow elevate dog kennels to the same constitutional status as churches. Rather, what these conditional uses all undeniably have in common is the fact that they are not "[n]atural resource activities such as farming and forestry" exempted from the zoning district's purpose to "provide lands for residential living in the rural area." CCC 18.303A.010. Even the dissent, after all, cannot argue that a church is a residence, a farm, or a forest.
The paperwork "burden" of the permitting process, as detailed in an epic footnote in the dissent, see Dissenting op. at 56-57 n. 12, is no less for secular uses than that imposed upon Open Door. Yet, curiously, the dissent makes no claim that the ordinance is also "openly and expressly hostile[,]" Dissenting op. at 59, to, say, residential care homes. The dissent would apparently have us believe that such secular land uses were only made subject to conditional use permits in order to mask Clark County's sinister "antireligious inquisition." Dissenting op. at 60. As for the "burden" imposed upon conditional uses, much of the information in the bound volumes of information that Open Door must submit consists of materials (e.g., maps) prepared and provided by the County itself. See CCC 18.404.025-.030. Surely this cannot reasonably be likened to religious persecution "practiced in some totalitarian nations." Concurrence in Dissent. at 62. In truth, the potential injury to Open Door (i.e., closure) that the dissent assumes will occur is possible only because Open Door first opened its doors before seeking permission to do so. It set up this possibility through an undeniable zoning violation and now complains of the opportunity it has been given to avoid closure.
We agree with the Tenth Circuit Court of Appeals that "[a] church has no constitutional right to be free from reasonable zoning regulations." Messiah Baptist Church, 859 F.2d at 826. Where does Open Door's position lead us? Under its position and that of the dissent, would churches within the City of Seattle be able to require Seattle City Light to make an individualized showing of "whether the means chosen to enforce the governmental interest were necessary and the least restrictive available to achieve the ends sought," Sumner, 97 Wash.2d at 8, 639 P.2d 1358, when that public *47 utility seeks to collect on a church's power bill?
Resonant through the dissent's rhetoric is an animus not so much toward the zoning at issue here but toward zoning itself, or, as the dissent calls it, "state coercion backed by naked force." Dissenting op. at 62. This, then, takes on the appearance of re-fighting battles already lost. See, e.g., Development Servs. of Am., Inc. v. City of Seattle, 138 Wash.2d 107, 121-133, 979 P.2d 387 (1999) (Sanders, J., dissenting to 8-1 decision upholding city's denial of conditional use permit for rooftop helistop). Let us recognize the extraordinary implications of the dissent's viewpoint. Under its position, a church would be free to construct a church building of apparently unlimited size in a residential neighborhood, without having to go through a process in which neighbors receive notification and an opportunity to be heard at a hearing.[15] Requiring the church to go through such an open, public process, the dissent asserts, would risk "potential tyranny." Dissenting op. at 50. According to the dissent, so long as basic "health and safety ordinances of general application" were complied with by that church, Dissenting op. at 60, the residential character of a neighborhood would be irrelevant, just as the rural residential nature of the zoning district in this case is immaterial to the dissent. Thus, for example, one could choose to live in a neighborhood for its entirely residential nature, wake up one morning and find that all other houses on one's block had been replaced by church buildings, and be left without any recourse. This could be so because, as the dissent argues, the values inherent in zoning are irrelevant, unless "peace and safety" are "compelling[ly]" infringed upon. Dissenting op. at 60.
We cannot subscribe to the dissent's view. The better approach, we think, is one advanced in First Covenant I by a noted guardian of religious free exercise, Justice Robert Utter, wherein he advocated that "we ought to require a very specific showing of hardship to justify exemption from land use restrictions in the future." First Covenant I, 114 Wash.2d at 415, 787 P.2d 1352 (Utter, J., concurring). This is in keeping with the fact that, as stated before, we "simply do not possess the power to amend zoning ordinances or to rezone a zoned area, and ... cannot and should not invade the legislative arena or intrude upon municipal zoning determinations, absent a clear showing of arbitrary, unreasonable, irrational or unlawful zoning action or inaction." Bishop, 69 Wash.2d at 792-93, 420 P.2d 368 (emphasis added).
Contrary to the dissent's claims, the centrality of religious free exercise among the protections enshrined by our state constitution is undisputed, and quite undiminished, by the very limited scope of this opinion. We simply observe that a
tension inevitably exists between the Free Exercise and the Establishment Clauses and ... it may often not be possible to promote the former without offending the latter. As a result of this tension, our cases require the State to maintain an attitude of "neutrality," neither "advancing" nor "inhibiting" religion.
Kallas v. Department of Motor Vehicles, 88 Wash.2d 354, 358, 560 P.2d 709 (1977) (quoting Committee for Pub. Educ. & Religious *48 Liberty v. Nyquist, 413 U.S. 756, 788, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973)). We find that the Court of Appeals in this case struck a reasonable balance on that delicate scale between the rights of the County and those of Open Door when it reversed that part of the trial court's ruling exempting Open Door from applying for a conditional use permit, while affirming that part of the ruling which required the County to "ensure that its [application] fees do not burden Open Door's worship" should Open Door demonstrate that such a burden would otherwise be present. Open Door Baptist Church, No. 22285-0-II, slip op. at 8. To agree with Open Door and the dissent in this case would add too much weight on one side of the scale that Kallas describes, for Open Door simply has not shown how the application process alone unconstitutionally burdens its religious free exercise. "[T]he measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." Lee v. Weisman, 505 U.S. 577, 598, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (quoting School Dist. of Abington v. Schempp, 374 U.S. 203, 308, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring)).

CONCLUSION
In conclusion, Open Door must comply with Clark County's conditional use application process. Unlike the dissent, we are not allowed to rule on the hypothetical outcome of this process, see Walker, 124 Wash.2d at 415, 879 P.2d 920, and can only say that Open Door might yet prevail in a free exercise claim if the conditional use permit it must seek is denied.[16] Finally, we agree with the Court of Appeals that Open Door should be permitted to use its building as a church during the permit process. The Court of Appeals is affirmed.
GUY, C.J., JOHNSON, MADSEN, TALMADGE, IRELAND, JJ., and KENNEDY, J.P.T., concur.
SANDERS, J. (dissenting).
This appeal raises two civil liberty issues: (1) Is the "absolute freedom" of religion guaranteed by the Washington Constitution article I, section 11, offended by a local ordinance which outlaws new churches absent compliance with an administratively burdensome conditional use permit regime; and/or (2) does an ordinance which vests unbridled discretion in a local administrator to preclude or condition religious exercise offend the First Amendment to the United States Constitution?
Although these issues are raised in the context of religious exercise, their disposition cannot be easily segregated from background principles common to all civil liberties.
We begin with some pertinent factual distinctions.
First, we are here concerned with the burden imposed by the administrative process rather than the outcome of that process. Accordingly, we ask whether the administrative burden is permissible under our constitutional article guaranteeing "absolute freedom" of religion. Wash. Const. art. I, § 11.
Second, we examine the process itself: Not only to measure the weight of the burden imposed on the church and its parishioners, but to assess the method by which the ordinance vests unbridled authority in a secular administrator to either permit, condition, or deny constitutionally protected religious exercise.
I conclude as follows:
1. The administrative imposition on the church to apply for and process a conditional use permit application is significant.
2. The burden is on the government, not the church, to justify the imposition.
3. There is no basis in this record to conclude requiring this church to process and obtain a conditional use permit is necessary, much less even related, to protect the public *49 against acts of licentiousness or threats to the public peace or safety.
4. Nor is there showing that these interests cannot be adequately protected by less restrictive means, i.e., laws of general application protecting against dangers of fire and promoting the public peace and safety.
5. Therefore I conclude under the plain meaning of article I, section 11, of the Washington Constitution, as well as the cases which have construed it, this ordinance is blatantly unconstitutional.
6. I also conclude this ordinance deprives these religious practitioners of their liberty without that minimum process due under the Fourteenth Amendment to the United States Constitution because it vests unbridled discretion in secular administrative officials to deny or condition the exercise of rights secured by the First Amendment to the United States Constitution.
I posit the following analysis which yields the above conclusions is supported by the plain language of the constitutional text, its theory, as well ample precedent from this court as well as the United States Supreme Court. I further posit the analysis of the majority is radically inconsistent with all of the above, and sets a precedent not only dangerous to religious liberty but inconsistent with our enjoyment of other civil liberties as well.

I.

"ABSOLUTE FREEDOM" OF RELIGION

UNDER THE WASHINGTON CONSTITUTION
The "absolute freedom" referenced in article I, section 11's constitutional guarantee of religious liberty is subject only to narrow and expressly enumerated exceptions for "acts of licentiousness" or "practices inconsistent with the peace and safety of the state." Zoning laws are subject to this constitutional guarantee, just as any other law, notwithstanding the majority's unsupported view to the contrary. Cf. Majority at 45-46. Under our state constitution, therefore, protection of free religious exercise is the rule, and any burden on that exercise must be the exception. Malyon v. Pierce County, 131 Wash.2d 779, 785-86, 935 P.2d 1272 (1997).
Here we deal with an absolute prohibition unlike any which we have seen before. At the time these facts arose Clark County expressly and simply prohibited establishment of new churches anywhere in the entire county absent special permission from secular authorities which could only be gained, if at all, through an extremely burdensome conditional use permit regime. After the record was closed, Clark County amended its ordinance to allow churches as a permitted use in some zones, but not this one.[1]
In the days our Fathers ratified our state constitution conditional use permits may not have been imagined; however, the importance of religious liberty was clearly understood, as was the threat posed to that liberty from virtually every level of government. Clearly the ratifiers understood they could neither foresee nor foretell every new twist or nuance of tyranny the 20th century might harbinge. Accordingly it would be most appropriate to begin the 21st century by recalling the faith of our Fathers that "A frequent recurrence to fundamental principles *50 is essential to the security of individual right and the perpetuity of free government," Const. art. I, § 32, and that "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." Const. art. I, § 29.
Let us then examine the facts before us, and measure them by the timeless principles and mandatory standard our constitution has provided.
To properly apply our constitutional guarantee of religious liberty, "[a]ppropriate constitutional analysis begins with the text and, for most purposes, should end there as well." Malyon, 131 Wash.2d at 799, 935 P.2d 1272.[2]
The first rule of constitutional construction is the rule that "[i]f a constitutional provision is plain and unambiguous on its face, then no construction or interpretation is necessary or permissible." Anderson v. Chapman, 86 Wash.2d 189, 191, 543 P.2d 229 (1975). The words used in the constitution must be afforded their common and ordinary meaning. State ex rel. O'Connell v. Slavin, 75 Wash.2d 554, 557, 452 P.2d 943 (1969). The "common and ordinary meaning" by which the constitutions must be understood is a meaning they would have had to the vast majority of ordinary voters who ratified the constitution in 1889. Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 510 (1984).
"Furthermore, the express mention of one thing in a constitution implies the exclusion of things not mentioned." Id. at 509-10 (citing Yelle v. Bishop, 55 Wash.2d 286, 295, 347 P.2d 1081 (1959)). Therefore, the express enumeration of exceptions to the general rule of religious freedom implies no others are permitted. There is no zoning law exception to that constitutional guarantee of religious freedom so clearly incorporated in our constitutional text. But see Majority at 45-46.

The Exception Proves the Rule
Applying these textual considerations, our state constitution mandates absolute religious freedom as the rule, infringement only if it fits within the plain meaning of one of three narrowly defined exceptions:
Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.

Const. art. I, § 11 (emphasis added).
There is no hint in the constitutional text that our religious freedom is in the least bit subject to the potential tyranny of even a majority, intolerant to religious practice in general or any sect in particular. But see Majority at 46 which would precondition the right of worship to a neighborhood public hearing.
The command of article I, section 11, is as clear as it is obligatory: "[N]o one shall be molested or disturbed in person or property on account of religion," unless that person or property is involved in acts of "licentiousness," *51 or "practices inconsistent with the peace and safety of the state." Const. art. I, § 11 (emphasis added); First Covenant Church v. City of Seattle, 120 Wash.2d 203, 224, 840 P.2d 174 (1992) (First Covenant II) ("Our state provision `absolutely' protects freedom of worship and bars conduct that merely `disturbs' another on the basis of religion. Any action that is not licentious or inconsistent with the `peace and safety' of the state is `guaranteed' protection.").
As these exceptions are decidedly narrow, regulations that infringe religious liberty must surmount article I, section 11's constitutional privilege by demonstrating the regulation is compellingly necessary to prevent acts of licentiousness, or is compellingly necessary to protect the peace and the safety of the state. If not, the regulation fails and religious freedom prevails.

Mere Assertion of Police Power Is Not Enough
The majority claims Open Door must yield to the police power of Clark County, purporting to prefer zoning as a "more substantive" exercise of the police power than landmark ordinances which we have struck down when in similar conflict with religious guarantees. Majority at 46. I disagree: if religious liberty, or any civil liberty for that matter, is at the mercy of the "police power" it is no civil liberty at all. Moreover, landmark ordinances are also "zoning" ordinances in the sense that they also attempt to regulate the use of land, and if they are not to be justified under the "police power"then what is their justification?
Notwithstanding the majority's attempt to distinguish "substantive" exercises of the police power from "nonsubstantive" ones, what would any express guarantee in our Declaration of Rights signify if it, like all else, were held hostage to the "police power," substantive or not? Cf. Nelson v. McClatchy Newspapers, Inc., 131 Wash.2d 523, 936 P.2d 1123 (1997) (newspaper exempt from police power prohibition against unlawful discrimination in employment under First Amendment freedom of press).
While assertion of the state's police power may prompt the constitutional analysis, contrary to the majority's ratio decidendi, it certainly does not end it. The constitutional text does not purport to equate the full range of potential police powerwhich itself has swelled, in at least the minds of some jurists, into a doctrine of plenary and seemingly unlimited authority[3]to the specific regulation of "licentiousness" or "practices inconsistent with the peace and safety of the state." Const. art. I, § 11. To the contrary, "[o]ur state constitution imposes limitations on the *52 otherwise plenary power of the State to do anything not expressly forbidden by the state constitution or federal law. Gunwall, at 66, 67, 720 P.2d 808. This also supports construing article 1, section 11 more broadly, to protect free exercise." First Covenant II, 120 Wash.2d at 225, 840 P.2d 174. To broaden these narrow exceptions to religious liberty to the outermost limits of plenary state power is to therefore utterly annihilate the constitution's "`paramount right'" of religious freedom. Munns v. Martin, 131 Wash.2d 192, 201, 930 P.2d 318 (1997) (quoting First Covenant II, 120 Wash.2d at 223, 840 P.2d 174).
The majority's analysis also ignores the very purpose and function of any civil liberty guarantee. Our constitution erects a wall of protection around our religious liberties over which the state, even in the exercise of functions otherwise constitutionally permissible, may not climb. To hold those narrow circumstances in which the broad[4] constitutional protection must yield includes the plenary power of government itself allows the exception to devour the rule, rendering the constitutional right illusory.
Our civil liberties, religious freedom being one of "vital importance,"[5] are not handmaids to the state's police power nor properly overthrown by a transitory majority on this court. Rather they are exalted by their nature and imperatives above the police power. That is the reason we have a Declaration of Rights in our constitution. Recognition and adherence to this fundamental principle "is essential to the security of individual right and the perpetuity of free government." Const. art. I, § 32 (emphasis added).

Strict Scrutiny
Our court has traditionally guarded with utmost vigilance the needle's eye through which government may rarely enter to thwart religious liberty. State ex rel. Bolling v. Superior Court, 16 Wash.2d 373, 133 P.2d 803 (1943).[6] Such vigilance is focused through the lens of strict scrutiny to critically review any state action which burdens the free practice of religion. This we have appropriately emphasized:
Since free exercise of religion is a fundamental right, [we apply] the strict scrutiny test of Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Under this test, the complaining party must first prove the government action has a coercive effect on the practice of religion. Once a coercive effect is established, the burden of proof shifts to the government to show the restrictions serve a compelling state interest and are the least restrictive means for achieving the government objective. If no compelling state interest exists, the restrictions are unconstitutional.
First United Methodist Church v. Hearing Exam'r for Seattle Landmarks Preservation Bd., 129 Wash.2d 238, 246, 916 P.2d 374 (1996) (citing First Covenant Church v. City of Seattle, 114 Wash.2d 392, 401-02, 787 P.2d 1352 (1990) (First Covenant I), vacated and remanded, 499 U.S. 901, 111 S.Ct. 1097, 113 L.Ed.2d 208 (1991), judgment reinstated by First Covenant II, 120 Wash.2d 203, 840 P.2d 174).
As set forth most recently in Munns, 131 Wash.2d 192, 930 P.2d 318, the relevant inquiry begins by asking whether a sincere religious belief is at stake. Id. at 199-201, 930 P.2d 318 (citing Backlund v. Board of Comm'rs, 106 Wash.2d 632, 639, 724 P.2d 981 (1986)). But no one here questions Open Door's sincerity. Majority at 38.
Next we must ask "whether the challenged enactment or action constitutes a *53 burden on the free exercise of religion." Munns, 131 Wash.2d at 200, 930 P.2d 318. Although our article I, section 11, precedents identify burdens on a case-by-case basis, we have observed in principle our constitution's guarantee of "[a]bsolute[ ] ... freedom of conscience in all matters of religious sentiment, belief and worship," such that "no one shall be molested or disturbed in person or property on account of religion," article I, section 11, means "If the `coercive effect of [an] enactment' operates against a party `in the practice of his religion,' it unduly burdens the free exercise of religion." Munns, 131 Wash.2d at 200, 930 P.2d 318 (alteration in original) (quoting First Covenant II, 120 Wash.2d at 226, 840 P.2d 174).

Burden of Proof on State, Not Church
If a burden on religious exercise is shown, then the state must justify that burden by demonstrating a compelling interest achieved by the least restrictive means. First Covenant II, 120 Wash.2d at 226-27, 840 P.2d 174. But once again, the majority turns this rule on its head by placing the burden on the church to make a "clear showing" that the zoning regulation at issue is "arbitrary, unreasonable, irrational or unlawful...." Majority at 43; see also Majority at 47-48.[7]
The majority acknowledges coerced closure of this church is a realistic scenario on remand but blames the parishioners, claiming this would only be "possible only because Open Door first opened its doors before seeking permission to do so." Majority at 46. However one needs no permission from the government to exercise a constitutional right. Indeed a fundamental tenet of our nation's First Amendment jurisprudence is the proposition that "a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).[8]
Prior restraint on religious exercise has been highly suspect at least since the time the United States Supreme Court told municipalities over half a century ago they could not require religious colporteurs to pay a license tax as a condition to the pursuit of their activities, even if the license ordinance were facially nondiscriminatory. See Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81 (1943); Follett v. Town of McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938, 152 A.L.R. 317 (1944). That is because under the United States Constitution, "[f]reedom of press, freedom of speech and freedom of religion are in a preferred position." Murdock, 319 U.S. at 115. See also Jimmy Swaggart Ministries v. Board of Equalization of Cal., 493 U.S. 378, 389, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (prior restraints on the free exercise of religious beliefs offend the Constitution). We do not tolerate prior restraint in cases involving freedom of speech or of the press. See, e.g., Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (striking down prior restraint on adult film broadcasting); JJR Inc. v. City of Seattle, 126 Wash.2d 1, 891 P.2d 720 (1995) (striking down prior restraint on nude dancing in adult nightclubs); Soundgarden v. Eikenberry, 123 Wash.2d 750, 871 P.2d 1050, 30 A.L.R.5th 869 (1994) (striking down "Erotic Music Statute" as prior restraint). The burden is therefore appropriately on the state to justify any burden on the exercise of rights falling under the First Amendment, including religious exercise.

Meaning of "Compelling Interest"
Moreover, "compelling interests" must indeed be compelling. They are only found *54 when "based in the necessities of national or community life such as clear threats to public health, peace, and welfare." Munns, 131 Wash.2d at 200, 930 P.2d 318 (citing First Covenant II, 120 Wash.2d at 226-27, 840 P.2d 174). A compelling interest is not demonstrated by merely "some supposed emergent situation," Bolling, 16 Wash.2d at 385, 133 P.2d 803 (emphasis added), but must arise from an actual emergency. Freedom of religion "can be restricted `only to prevent grave and immediate danger to interests which the State may lawfully protect.'" State ex rel. Holcomb v. Armstrong, 39 Wash.2d 860, 864, 239 P.2d 545 (1952) (quoting West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943)). This test "requires proof that the state interest is not only compelling, but cannot be sufficiently served in any other way." City of Sumner v. First Baptist Church, 97 Wash.2d 1, 15, 639 P.2d 1358 (1982). We have used the compelling interest test without deviation in the last two decades to strike down soi-disant police power regulations that encroached on religious exercise. See Sumner, 97 Wash.2d at 13-14, 639 P.2d 1358 (no compelling interest in citing for contempt for, and enjoining a church from, maintaining a religious school contrary to local zoning); First Covenant II, 120 Wash.2d at 227-28, 840 P.2d 174 (city's interest in landmark preservation not compelling); First United Methodist Church, 129 Wash.2d at 252-53, 916 P.2d 374 (city's interest in landmark designation of a church building not compelling); Munns, 131 Wash.2d at 199-201, 930 P.2d 318 (city's interest on historical landmark grounds to prevent church from demolishing church building not compelling).

Weighing the Burden on Religion
The linchpin of the majority's decision is that "Open Door has simply not met its threshold requirement of establishing that Clark County's actions caused anything more than an incidental burden upon the free exercise of religion." Majority at 46. Furthermore, the majority asserts, the Clark County ordinance is "facially neutral with respect to churches." Majority at 37.
Even if this were true (which it is not) we have held on several occasions that "[a] facially neutral, even-handedly enforced statute that does not directly burden free exercise may, nonetheless, violate article 1, section 11, if it indirectly burdens the exercise of religion." First Covenant II, 120 Wash.2d at 226, 840 P.2d 174 (emphasis added) (citing Sumner, 97 Wash.2d at 7-8, 639 P.2d 1358, and Bolling, 16 Wash.2d at 385-86, 133 P.2d 803). This rule was explicitly recognized in Sumner, as the majority quotes at page 39, that "`[A]ny incidental burden on the free exercise of appellant's religion may be justified [only] by a "compelling state interest in the regulation of a subject within the State's constitutional power ..."'" Sumner, 97 Wash.2d at 7-8, 639 P.2d 1358 (alterations in original) (quoting Sherbert v. Verner, 374 U.S. at 403, 83 S.Ct. 1790).
But the majority trumps these essential protections of religious liberty and their application to this case. If our previous words mean what they saythat any incidental burden on religion triggers strict scrutiny, as the majority quotes from Sumnerand if the majority is right that Open Door has shown (even if, the majority thinks, merely) "an incidental burden upon the free exercise of religion," Majority at 46, then the majority's opinion is not only wrong but incoherent. If the majority means to overrule Sumner and First Covenant II let it say so. If not, the majority is barred by our own precedent.
Notwithstanding, what the majority calls "facially neutral" zoning with respect to churches, Majority at 37, is actually a countywide prohibition expressly singling out, by name, all new churches lacking a conditional use permit. The code singled out churches for this special disadvantage, unlike all manner of residential, industrial, and commercial usesincluding adult entertainment theaters, liquor stores, and manufacturers which are permitted outrightallowing churches as of right nowhere in the entire county, even when in full compliance with all laws of general application. Clark County Code (CCC) 18.303.030(A) (Rural Estate Districts) (repealed); 18.303A.030(A) (Rural Districts); 18.304.030(A) (Rural Center Residential *55 Districts); 18.305.030(A) (Urban Reserve Districts); 18.306.030(A) (Urban Holding Districts); 18.307.030(A) (Single-Family Residential Districts); 18.308.030(A) (Single-Family Residential Districts); 18.311.021(E)(1) (Residential Districts); 18.312.020(G)(1) (Office Residential); 18.313.020(S)(7) (repealed)[9] In consequence, to establish a church use anywhere in Clark Countyhowever unobstreperous and benign religious practitioners must first submit to an expensive and extremely detailed permitting process of doubtful outcome administered wholly at the discretion of secular authorities.
The burden we here review centers on the administrative process required of a church to exist in Clark County. As such it is an "administrative burden" much heavier than the likes of that which we struck down in First Covenant I and II, First United Methodist, and Munns. The substance and form of the coerced conditional use permit application process is codified in CCC 18.404. This code chapter was amended after the facts of this case arose, although the amended version is procedurally and substantively similar to that which preceded it. As the county contends the church is not vested to the earlier version of the code, and because the majority remands with instructions that the church be banned in lieu of compliance with the current conditional use permit ordinance, further references are properly to the current version of the ordinance.
First, the ordinance makes clear it is not of general application but is designed to give "special consideration" to each individually requested use. CCC 18.404.010. Therefore we must distinguish all ordinances of general application from our analysis.[10]
Second, the ordinance grants unlimited authority to the hearings examiner (formerly, the planning commission) to "approve, approve with conditions, disapprove, or revoke" the permit pursuant to the chapter. CCC 18.404.020. This places the future of the churchbuilding and practicein the discretionary hands of a secular member of the executive branch. Church officials must plead to secular authority for their very right to existan overreach by the State that we have previously heldin a more benign manifestation to be oppressive. First Covenant II, 120 Wash.2d at 219, 840 P.2d 174 ("The ordinances burden free exercise `administratively' because they require that First Covenant seek the approval of a government body before it alters the exterior of its house of worship, whether or not the alteration is for a religious reason."). If seeking a secular imprimatur before merely altering a church building is an impermissible administrative burden, then a fortiori submission to this almost unlimited secular discretion simply to establish a church must be an even greater outrage against religious liberty.
Third, the applicant must prepare and submit nine bound volumes of plans, application *56 forms, zoning, vicinity, topological, and soils maps, aerial photographs, environmental information including water courses, soil stability studies, wildlife habitat information, historic and cultural information, and detail all nearby land use and transportation facilities, for county bureaucratic review at a preapplication conference.[11] Thus commences the hearings gauntlet. CCC 18.404.025.[12] *57 Fourth, eight bound volumes of an even more detailed actual application for the conditional use permit must then be prepared and submitted at applicant expense. CCC 18.404.030. We disapproved such submittal requirements in Munns and First United Methodist where we refused to countenance an ordinance providing,
[T]he Church must submit plans to the [landmarks preservation] board, a secular body, and negotiate possible alterations. That requirement creates unjustified governmental interference in religious matters of the Church and thereby creates an infringement on the Church's constitutional right of free exercise.
Munns, 131 Wash.2d at 207, 930 P.2d 318 (alterations in original) (quoting First United Methodist Church, 129 Wash.2d at 247, 916 P.2d 374). See also First Covenant II, 120 Wash.2d at 222, 840 P.2d 174 ("The governmental oversight of church action that the City reserves to itself ... impermissibly burdens free exercise."). But here the governmental interference, and hence the burden, cuts deeper.
Fifth, the ordinance empowers a county hearings examiner to "impose, in addition to regulations and standards expressly specified in this title, other conditions found necessary to protect the best interests of the surrounding property or neighborhood, or the county as a whole." CCC 18.404.060.[13] Nowhere does the ordinance limit the meaning of "best interest" to that which is compellingly necessary to protect the peace and safety of the state. This feature must also be independently reviewed by First Amendment criteria in Part II, infra.
If it were an impermissible administrative burden in First Covenant II to require the church to "seek the approval of a government body before it alters the exterior of its house of worship, whether or not the alteration is for a religious reason," First Covenant *58 II, 120 Wash.2d at 219, 840 P.2d 174, the raw power of the hearings examiner in Clark County over even trivial minutiae of Open Door's property is of even greater burden. Such is but an extension of the unbridled discretion we rightly condemned in First Covenant II, this case (Open Door) being more aggravated. Here the discretion of the governmental body in Clark County to impose conditions over both religious and nonreligious uses of the Open Door property goes unrestrained by the rule of law and in contempt for fundamental civil liberties.
We struck down the ordinance at issue in Munns, just as we did in First Covenant I, because "[t]he practical effect of the provisions is to require a religious organization to seek secular approval of matters potentially affecting the Church's practice of its religion." Munns, 131 Wash.2d at 206, 930 P.2d 318 (quoting First Covenant I, 114 Wash.2d at 406, 787 P.2d 1352). But the weight of this administrative burden is demonstrably much greater.
Open Door has already been forced to submit to a public hearing to defend itself and its religious exercises from complaints by the county that it was operating as a church without a conditional use permit.[14] To seek a permit Open Door must now go public once again to plead the favor of a hearings examiner. In Munns, we adjudged the public hearing requirement, per se, an unacceptable administrative burden:
The ordinance provides for a public hearing. Must the Bishop attend such a hearing? To what purpose if the Bishop declines to alter the Church's future plans? But more significantly here, the additional delay is specifically for the purpose of permitting opponents of the proposed demolition to attempt to broker various alternatives to the church's planned religious purpose for the structure.... If the Bishop is unwilling to entertain alternatives, or if none meets his requirements, and he is unwilling to delay his plans, he must then seek approval of the secular authorities to lift the stay and allow him to proceed with his plans to carry out his religious mission. The challenged ordinance creates precisely the kind of administrative burdens First United Methodist forbids.
Munns, 131 Wash.2d at 208, 930 P.2d 318. The negotiations between secular and ecclesiastical authority envisioned by the public hearingwhich actually occurred during the public hearing in this case, Clerk's Papers (CP) at 322-28we held "not permissible" in Munns, 131 Wash.2d at 210, 930 P.2d 318, and an "unjustified governmental interference" in First Covenant II, 120 Wash.2d at 222, 840 P.2d 174.
These are not merely "potential" administrative burdens. Cf. Majority at 42. Rather, the church is actually coerced to build and then surmount this mountain of paperwork, pleading to secular authorities in this preapplication conference, running this public hearing gauntlet, simply in order to exist. Were this merely "potential harm" to Open Door's free exercise, as we held in Munns, even a potential administrative burden is an impermissible burden. Munns, 131 Wash.2d at 208, 930 P.2d 318 ("The city ordinance in this case burdens the Bishop administratively by causing potential delay in the Bishop's plans to demolish the school building and construct a pastoral center." (emphasis added)). Likewise, in First United Methodist Church, we held mere landmark designation of the church was a burden because of the "severe restrictions" on the church's use of its building. 129 Wash.2d at 244, 916 P.2d 374. The majority attempts to distinguish the "potential" burdens in Munns and First United Methodist. However, its suggestion that the Clark County ordinance does not place "severe restrictions" on Open Door's use of its land is oblivious to the nature and extent of the process to which a church in Clark County must succumb to merely win the right to exist from the government precisely the opposite of the inalienable right our Constitution guarantees to the religious to protect them against government interference.
*59 Moreover the burden is also financial, as Open Door's application must be accompanied by a fee in excess of $5,500.[15] Because the county assures us in oral argument that it will have expended more than twice that amount to investigate and evaluate the nine bound volumes submitted at the applicant's expense, the further question arises: At what cost will the applicant be required to produce the required volumes of submittals in the first instance?
Why churches, unlike most other residential, commercial, or industrial uses, are singled out for prohibition absent a conditional use permit is not clear from the record nor does the county even attempt to justify it. This absence of justification in itself should be dispositive. It is obvious churches are in fact singled out, not only as a category of use otherwise prohibited but for a conditional use permit, but also singled out on an individualized basis in terms of every aspect of their design, use, and function reviewed under the virtually standardless conditional use permit ordinance. Indeed one can scarcely imagine a more comprehensive and open-ended regulation of church affairs by secular authorities than what we have here. The conditional use permit application process is undeniably burdensome, yet the necessity of the burden is neither defended by the county nor the majority.
I therefore emphatically disagree with the majority: Open Door has indeed demonstrated a dramatic, all-encompassing burden on its free exercise by this ordinance. And this ordinance is not, as the majority says, "facially neutral" to religionit is openly and expressly hostile to religion. But we should not be neutral to our Constitution's guarantee of religious liberty, nor deaf to the anguish of the faithful who call us to our constitutional duty to defend their rights.

What Compelling Interest?
What compelling state interest does Clark County muster to support this scheme which prohibits churches absent a conditional use permit? The majority admits no interest is offended by "interim operation" absent a permit. Majority at 42. Yet the majority fails to explain what compelling interest might be offended by indefinite operation without a permit, if there is no compelling interest offended by interim operation absent a permit.
As recalled above, a "compelling interest" is "based in the necessities of national or community life such as clear threats to public health, peace, and welfare," Munns, 131 Wash.2d at 200, 930 P.2d 318 (emphasis added), and "grave and immediate danger to interests which the State may lawfully protect," Holcomb, 39 Wash.2d at 864, 239 P.2d 545 (emphasis added) (quoting West Virginia State Bd. of Educ., 319 U.S. at 639, 63 S.Ct. 1178). What "clear threat," or "grave and immediate danger" to public peace or safety is rebuffed by forcing one to apply for a conditional use permit, per se?
Beyond vague incantations of its police power, neither Clark County nor the majority has elucidated any interest, let alone a compelling one, to premise Open Door's very existence on submitting an application for, processing, and then obtaining a conditional use permit. Perhaps the county would argue its asserted interest in control over the landscaping, midnight services, parking lot gravel, driveway size, steeple height, etc., of the Open Door church arises from the necessities *60 of national or community life to avoid a clear threat to the peace or safety of the statea derisory argument, but, I think, the best the county and the majority could hypothetically muster. But even then the argument must fail as none of those prohibitions or limitations are at issue herebut rather the requirement of preparing a detailed application for, and then actually obtaining a conditional use permit, per se. Clark County's "uncompromising and rigid," Sumner, 97 Wash.2d at 9, 639 P.2d 1358, refusal to exempt Open Door from the conditional use permit requirement it imposes on each and every church across the county demonstrates an inflexible design to burden, but speaks nothing of acts of licentiousness or compelling threats to peace and safety which are the only constitutionally permissible predicates to justify imposition of such a burden. It is the burden of bureaucracy for its own sake.
Although landmark or historical preservation ordinances may further cultural and aesthetic interests, they certainly "do[] not prevent licentious behavior, or ensure peace or safety." First Covenant II, 120 Wash.2d at 236, 840 P.2d 174; Munns, 131 Wash.2d at 201, 930 P.2d 318. Likewise requiring a church in Clark County to apply for and obtain a conditional use permit in and of itself does nothing to further even cultural or aesthetic interests, let alone actually protect peace and safety, nor does it prevent licentious behavior.

Least Restrictive Means
As Clark County has not articulated a specific compelling interest within the constitutionally enumerated exceptions of "licentiousness," "peace," and "safety" to justify its conditional use scheme, the "least restrictive means" prong of the strict scrutiny is not even implicated. But even assuming arguendo Clark County has a particular compelling interest to protect the peace and safety of its citizens vel non from churches, and also assuming this permitting process, as such, does so protect, clearly less restrictive means than this conditional use permit can be imagined to provide that protection. In fact, Open Door concedes it should, and would, and will, comply with all health and safety ordinances of general application. CP at 313. Why aren't those neutral, generally applicable ordinances sufficient for a churchwhen they are apparently sufficient for nearly every other human social, commercial, or industrial endeavor?
As a double protection to the public and private interests, arguably without running afoul of article I, section 11, the county might entertain a suit in public nuisanceand a neighboring landowner in private nuisance if the secular components of Open Door's use of its premises infringes in specific, identifiable, and compelling ways upon the peace or safety of the state. But here Clark County attempts to zone Open Door out of existence by use of the conditional use permit process, and does inflexibly and aggressively refuse to grant Open Door an exemption to the burdensome and expensive process of seeking the permit on account of its constitutionally privileged religious status.
Whatever the breadth and scope of the police power interest to justify zoning in principle, religious liberty is a constitutional inheritance from the Founders which may not be diminished or compromised except to protect against breaches of the peace and safety in the most compelling circumstances. Only in this way may we protect this "fundamental principle[ ] ... essential to the security of individual right and the perpetuity of free government." Const. art. I, § 32. "[I]t is proper to take alarm at the first experiment on our liberties,"[16] but Clark County has erected a laboratory, and embarked upon an antireligious inquisition.

II.

UNBRIDLED ADMINISTRATIVE DISCRETION

OFFENDS FIRST AMENDMENT
An ordinance such as this which vests unbridled discretion in an administrative governmental *61 official violates the First Amendment on its face:
"It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an officialas by requiring a permit or license which may be granted or withheld in the discretion of such officialis an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."
Shuttlesworth, 394 U.S. at 151, 89 S.Ct. 935 (quoting Staub v. City of Baxley, 355 U.S. 313, 322, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958)). According to the majority this is an "inapposite First Amendment freedom of expression case...." Majority at 46. Apparently it is the view of the majority that what would be an unconstitutional exercise of administrative discretion with regard to parade permits is a permissible exercise of administrative discretion when it comes to interfering with religious exercise. Other than harmonizing its rhetoric with its result, I can see neither logic nor rational justification for the distinction. The First Amendment does not make religious exercise a poor cousin to free speech or freedom of the pressit is only today's majority which does that.
Open-ended conditions on religious exercise discretionarily imposed by the administrator may include stricter bulk and scale requirements than are imposed on neighboring secular structures, limitations on automobile access beyond those imposed by the general laws, landscaping requirements for purely aesthetic purposes, dictation of building design which desecrates the religious purpose, etc.[17]
Indeed a shocking example of actual hearings-examiner-imposed conditions on church operation is furnished by the very hearings examiner order at issue in this appeal.[18] That order not only conditioned future church operation on timely compliance with the foregoing submittal and permitting requirements but prohibited all church services after 10:00 p.m. and before 6:00 a.m., without exception. See Notice and Order V(1)(d), CP at 66. Therefore the pastor who conducts midnight Christmas Eve services and/or Easter sunrise services invites persecution through coercive governmental reprisals, including a monetary penalty. Id.[19]

CONCLUSION
What differentiates this case from the landmark ordinance cases where we found in *62 favor of the churches?[20] Apparently it is the majority's suggestion that a decision in favor of Open Door would somehow open Pandora's box. Among the parade of horribles the majority predicts is the specter that a city light company could not collect on its light bill against a church without infringing upon the church's free exercise rights. Majority at 46-47. This is fantasy; however that the majority dramatically undercuts our constitutional guarantee of religious liberty is a stark reality.
This is not the case of a church asserting a "constitutional right to be free from reasonable zoning regulations." Majority at 46 (quoting Messiah Baptist Church v. County of Jefferson, 859 F.2d 820, 826 (10th Cir. 1988)). Rather this is the case of a church asserting a constitutionally protected right to exist free of governmental interference that is not narrowly tailored to protect a constitutionally identified compelling interest, and to be free of excessive administrative discretion in the exercise of First Amendment rights.
Zoning laws, even more than other assertions of the "police power," have apparently acquired such a hallowed status in the minds of the majority that my brothers and sisters fail to grasp such laws are as every other instruments of state coercion backed by naked force.[21]
As George Washington warned: "Government is not reason, it is not eloquenceit is force! Like fire it is a dangerous servant and a fearful master; never for a moment should it be left to irresponsible action." President George Washington, "Farewell Address to the People of the United States" (Sept. 1796), in Claypole's Daily Advertiser, reprinted in George Seldes, The Great Quotations 727 (Carol Publ'g Group 1993).[22] Civil liberties, however, the state may not abridge even in the exercise of its so-called police powers. That is why we have a Declaration of Rights in our constitution: To protect our liberties against state action. Religious freedom is at the foundation of those liberties and our Forefathers struggled to preserve it at whatever cost. We must do no less.
I dissent.
SMITH, J. (concurring specially in the dissent).
I cannot adopt the expansive rhetoric of the dissent, but I nevertheless agree in principle with its conclusion that the Clark County ordinance in this case, as applied to the Open Door Baptist Church, imposes an impermissible burden upon religion in violation of Const. art. I, §§ 2 and 11. It is my strong belief that our courts must at all times stand as a bulwark between the State and the church to assure the free exercise of religion guaranteed by our Constitution. The courts must then be vigilant against seemingly minimal encroachments by the State which would lead us towards sanctioned government intervention such as practiced in some totalitarian nations characteristically controlling the exercise of religion through licensing *63 schemes requiring ultimate approval by secular authorities.
NOTES
[1] The examiner also identified various conditions that "pose an imminent threat to public health, safety and welfare" and ordered remedies (e.g., fire and health inspection of the well and septic system) which were not subject to later appeal by Open Door. CP at 64.
[2] 97 Wash.2d 1, 639 P.2d 1358 (1982).
[3] Open Door would later assert that "[t]he waiver of the issue of finances related only to the civil rights claim for damages," although no such restriction is apparent on the face of the stipulation. Resp'ts' Br. at 24.
[4] The dissent would have us reach an issue not raised in this case, by arguing that "to establish a church use anywhere in Clark County ... religious practitioners must first submit to an expensive and extremely detailed permitting process of doubtful outcome administered wholly at the discretion of secular authorities." Dissenting op. at 55 (emphasis added); see also Dissenting op. at 54 (referring to a "countywide prohibition" on "all new churches lacking a conditional use permit" (emphasis added)); Dissenting op. at 60 (referring to the County's "refusal to exempt Open Door from the conditional use permit requirement it imposes on each and every church across the county" (emphasis added)). Not only is this not an issue in this case, see RAP 13.7(b), but it is incorrect and contradicted in one sentence of the text and in a footnote in the dissent itself, which contains the rhetorically inconvenient concession that the current Clark County Code allows "churches without a conditional use permit in several zones." Dissenting op. at 55 n. 9 (citing CCC 18.313.020). To dispel some hyperbole, it is worth noting that the "antireligious inquisition" in Clark County that the dissent accuses us of sanctioning, Dissenting op. at 60, has apparently been quite unsuccessful, the Clark County/Vancouver telephone directory containing over 200 listings for churches or synagogues.
[5] Open Door does not renew in its petition for this court's review its earlier claim, rejected by the Court of Appeals, that "[w]here the County allows a nonconforming use of the building as an art school/studio without a conditional use permit and then allows the church to be a nonconforming use for five years, without permit, then the County should be estopped from asserting a violation of the conditional use permit code." Resp'ts' Br. at 22-23. The County has, however, informed the church, as part of the conditional use permit preapplication process, that "[t]he historic status of the church may be influential in meeting the variance criteria, in justifying an `unusual circumstance' that applies to the property." CP at 107.
[6] But see State v. White, 135 Wash.2d 761, 958 P.2d 982 (1998). In White we concluded, in light of guidance from a wealth of cases differentiating Const. art. I, § 7 from the Fourth Amendment, that "[o]nce we agree that our prior cases direct the analysis to be employed in resolving the legal issue, a Gunwall analysis is no longer helpful or necessary." White, 135 Wash.2d at 769, 958 P.2d 982. However, we added the caveat that "[a] Gunwall analysis is nevertheless required in cases where the legal principles are not firmly established." White, 135 Wash.2d at 769 n. 7, 958 P.2d 982. This is certainly such a case.
[7] Const. art. I, § 11, in relevant part, provides as follows:

"Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state."
[8] First United Methodist Church v. Hearing Examiner, 129 Wash.2d 238, 246, 916 P.2d 374 (1996). This step went unmentioned in Sumner, which appeared to merely assume (not unreasonably, in light of the injunction) that the threshold coercive effect was present.
[9] Open Door quarrels with this reading of Sumner, but its own interpretation does not in any way contradict the facts as recounted by the Court of Appeals. See Pet. for Review at 6; see also Sumner, 97 Wash.2d at 17-18, 639 P.2d 1358 (Dolliver, J., dissenting) (explaining facts regarding church's special use permit application).
[10] Munns is an especially important case for purposes of Const. art. I, § 11 analysis, because we analyzed the issues in Munns exclusively under Const. art. I, § 11, despite the fact that the First Amendment was also raised. See Munns, 131 Wash.2d at 199 n. 3, 930 P.2d 318 (citing State v. Hendrickson, 129 Wash.2d 61, 69, 917 P.2d 563 (1996)).
[11] Although it is not expressly stated in the Court of Appeals' unpublished opinion, see Dissenting op. at 61 n. 18, we find that the practical effect of the decision is to vacate the portion of the hearing examiner's order limiting hours of operation, which the dissent points out might have had the effect of prohibiting midnight services on Christmas Eve or Easter sunrise services.
[12] It appears as though Open Door is revisiting this issue in its petition for review when it writes:

"The Court of Appeals ruled that the church should make application for a conditional use permit, the county may waive its fees, but the church must justify waiver of the fees. This the Court of Appeals does without any authority.
"... Here, at the trial court, it was contended by the church that the financial burden would be a prior restraint on religious conduct because the church state interest, where there is no authority justifying a state interest at this time." Pet. for Review at 10-11. Frankly, whatever argument is being made here is incomprehensible.
[13] An inability to pay argument has always been the lesser of Open Door's arguments, as evidenced by its earlier stipulation "that the cost of land use permits ... is not an issue. The permit process is the issue." CP at 349 (emphasis added).
[14] See First Covenant II, 120 Wash.2d at 234, 840 P.2d 174 (Utter, J., concurring) ("A truly independent state constitutional discourse cannot occur if we resort solely to federal jurisprudence in defining rights protected under our state constitution." (emphasis added)) (citing James A. Gardner, The Failed Discourse of State Constitutionalism, 90 MICH. L. REV. 762 (1991-92)).
[15] In a statement with overbroad implications, the dissent asserts that we "would precondition the right of worship to a neighborhood public hearing." Dissenting op. at 50. Again, we are not reaching the question of what would happen if the result of this public process was a denial of the church's conditional use permit. However, even in the abstract, it is worth noting that the "right of worship" is always intact, quite apart from the settings in which it might be exercised. As the United States Supreme Court has written, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." West Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943). Moreover, this court, time and again, has proven its willingness to confront the sort of raw majoritarianism that the dissent fears might result in the denial of a church's conditional use merely because its message is unpopular. See, e.g., State ex rel. Bolling v. Superior Court, 16 Wash.2d 373, 133 P.2d 803 (1943) (overturning, as a violation of Const. art. I, § 11, a trial court ruling removing three minor children from their parents' custody for not obeying, due to their religious upbringing as Jehovah's Witnesses, a state law requiring public school students to pledge allegiance to the United States flag).
[16] Should that day occur, it is, of course, quite implausible to suggest, as the dissent does, that this court would analyze the denial of a conditional use permit for a church in the same fashion that it would analyze the denial of such a permit for a dog kennel or other conditional use. See Dissenting op. at 62 n. 21. Religious free exercise remains an area around which government must tread very lightly. Precedent makes it clear that closure of a church would require a compelling state interest. See Sumner, 97 Wash.2d 1, 639 P.2d 1358 (in absence of a compelling state interest, dissolving injunction preventing use of church-operated school).
[1] The majority claims the countywide prohibition of a church use is not an issue in this case, citing RAP 13.7(b), which generally states we will only consider issues raised in the petition for review. Majority at 37 n. 4. However, the petition for review challenged the constitutionality of the conditional use permit requirement (issues 2 and 3), whereas the universal application of the prohibition absent such a permit was specifically called to our attention in appellant's brief (Br. of Appellant at 3) and again in oral argument.

The majority also tells us a review of the phone book demonstrates many churches currently exist in Clark County. However, the relevance of this fact the majority does not explain, as the constitutional rights of this church and these parishioners are at issue here, not the rights of others. Were, however, our inquiry not constrained by the boundaries of relevance, an inquiring mind might well query the majority to disclose how many (if any) of these existing churches have a conditional use permit at all, and how many of these churches escaped the conditional use permit entirely because they established their church prior to the effective date of the subject ordinance. Also of interest would be the nature of any conditions attached to any conditional use permit so issued.
[2] The majority deigns to analyze Open Door's article I, section 11, claim despite the majority's assertion, at page nine, that Open Door failed to brief the six factors laid out in State v. Gunwall, 106 Wash.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986). However the rule is clear when previous decisions of this court have already held that a state constitutional provision provides greater protection than its federal counterpart, the Gunwall analysis need not be repeated. State v. White, 135 Wash.2d 761, 769, 958 P.2d 982 (1998); State v. Hendrickson, 129 Wash.2d 61, 69-70 n. 1, 917 P.2d 563 (1996). Contrary to the majority's suggestion that the "`legal principles'" in this area "`are not firmly established,'" Majority at 38 n. 6 (quoting White, 135 Wash.2d at 769 n. 7, 958 P.2d 982), further analysis under Gunwall is unnecessary as we have repeatedly held that article I, section 11 of the state constitution provides greater protection to free exercise than does the First Amendment to the United States Constitution. First Covenant Church v. City of Seattle, 120 Wash.2d 203, 223-25, 840 P.2d 174 (1992) (First Covenant II); First United Methodist Church v. Hearing Exam'r for Seattle Landmarks Preservation Bd., 129 Wash.2d 238, 249-50, 916 P.2d 374 (1996); Munns v. Martin, 131 Wash.2d 192, 199, 930 P.2d 318 (1997). There is no need to "reinvent the wheel." Aviation West Corp. v. Department of Labor & Indus., 138 Wash.2d 413, 426, 980 P.2d 701 (1999).
[3] Unlike the constitutional protections of religious liberty, the term "police power" is not defined by our state constitution. In its origin, the term was used to describe regulations which protect persons and property from the harmful, rights-violating, activities of one's neighbors as summarized in the Latin maxim sic utere tuo ut alienum non laedas ("[O]ne should use his own property in such a manner as not to injure that of another." Black's Law Dictionary 1380 (6th ed.1990)). For historical discussion and perspective, see Weden v. San Juan County, 135 Wash.2d 678, 723-29, 958 P.2d 273 (1998) (Sanders, J., dissenting). However, whatever principled boundaries which may have once constrained the concept, these limitations have been nearly erased through a series of decisions culminating in the conclusion that even construction of a baseball stadium is a legitimate exercise of police power. CLEAN v. State, 130 Wash.2d 782, 806, 928 P.2d 1054 (1996). Cf. Weden, 135 Wash.2d at 700-01, 958 P.2d 273 (absolute prohibition of jetskis out to the middle of the Strait of Juan de Fuca is a legitimate exercise of the "police power"); Development Servs. of Am., Inc. v. City of Seattle, 138 Wash.2d 107, 119-20, 979 P.2d 387 (1999) (denial of a helistop conditional use permit based upon the absence of private business necessity is a legitimate exercise of the police power). Apparently the majority would deem a baseball stadium a "substantive" exercise of the police power whereas interference with religious exercise is nonsubstantive. Notwithstanding, if religious liberty is subject to the "police power," ("substantive" or not), what remains of religious liberty?

The majority, in ad hominem fashion, suggests that this observation regarding the expansion of the police power "takes on the appearance of refighting battles already lost" (Majority at 47), noting these decisions were rendered over the dissent of your undersigned. However, the majority makes the point of this dissent: it has expanded the scope of the police power to such an extent that seemingly nothing, or at least very little, may coexist in a field so fully occupied. The majority cannot have it both ways: it cannot claim religious liberty is subject to the police power while at the same time claiming there is much left of religious liberty.
[4] First Covenant II, 120 Wash.2d at 224-25, 840 P.2d 174 (stating that article I, section 11, is to be read broadly to protect free exercise).
[5] State ex rel. Bolling v. Superior Court, 16 Wash.2d 373, 381, 133 P.2d 803 (1943).
[6] In Bolling we noted,

It is one of the most important duties of our courts to ever guard and maintain our constitutional guarantees of religious liberty, and to see to it that these guarantees are not narrowed or restricted because of some supposed emergent situation, or because it may be considered that the enforcement of some law or regulation circumscribing religious liberty would be of little consequence as possibly affecting only a few persons, or because the consequences of the impingement upon the constitutional guarantees may appear insignificant.
Id. at 385-86, 133 P.2d 803.
[7] The cases cited by the majority as authority for this startling proposition do not involve First Amendment concerns and thus are facially inapplicable. Bishop v. Town of Houghton, 69 Wash.2d 786, 420 P.2d 368 (1966) and McNaughton v. Boeing, 68 Wash.2d 659, 414 P.2d 778 (1966), involve zoning disputes that invoke no comparable constitutional rights. Furthermore, the language the majority lifts from First Covenant I, Majority at 47, comes not from the court's majority opinion but rather from a concurring opinion signed by only two Justices.
[8] Shuttlesworth v. City of Birmingham addresses free expression under the First Amendment, which equally protects free exercise of religion. 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).
[9] The Clark County Code was subsequently amended to allow churches without a conditional use permit in several zones. See, e.g., Clark County Code (CCC) 18.313.020.
[10] The majority looks to bolster its position with the reasoning of Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which exempts neutral, generally applicable laws from the Sherbert v. Verner compelling interest test. Majority at 43-44. Because it erroneously assumes the zoning at issue here is neutral and generally applicable, the majority lumps this case with Smith and the handful of federal cases using a similar rationale. Majority at 44-45. But the majority forgets a conditional use permit is anything but a "neutral, generally applicable law" and overlooks the clear language in Smith itself, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of `religious hardship' without compelling reason." Smith, 494 U.S. at 884, 110 S.Ct. 1595 (citations omitted). As we previously determined in First Covenant II, "The landmarks ordinances at issue here are unlike a [neutral, generally applicable law] because they invite individualized assessments of the subject property and the owner's use of such property, and contain mechanisms for individualized exceptions." 120 Wash.2d at 215, 840 P.2d 174. The same is certainly true of Clark County's conditional use permit ordinance. CCC 18.404.010. But the Smith rule is significant in its distinction from our facts. See also Sarah J. Gralen Rous, Comment, Why Free Exercise Jurisprudence in Relation to Zoning Restrictions Remains Unsettled after Boerne v. Flores, 52 SMU L.Rev. 305, 327 (1999) ("[U]nder the reasoning of Smith, most, if not all, zoning legislation must be exempted from the Smith rule and warrants application of the compelling interest test.").
[11] The majority claims "much of the information in the bound volumes of information that Open Door must submit consists of materials (e.g., maps) prepared and provided by the county itself." Majority at 46. But even if so, and I see no text in the ordinance which assures us this must be so, what "compelling interest" is there to burden the church to recopy and return to the county that which the county already has?
[12] 18.404.025 Pre-application submittal requirements for a conditional use permit.

A. A pre-application conference is required for all conditional use permit applications. See Section 18.600.030 of this title regarding pre-application review generally.
B. An applicant for a pre-application review of a conditional use permit shall submits [sic] nine (9) individually bound copies of the following materials. The proposed plan shall be drawn to an appropriate scale (scales should not generally be smaller than one (1) inch equals two hundred (200) feet and sheets no larger than twenty-four (24) inches by thirty-six (36) inches), and include reduced copies at an eleven (11) inch by seventeen (17) inch size for all sheets larger than eleven (11) inches by seventeen (17) inches. In order to ensure contingent vesting pursuant to Section 18.600.055, all of the required information under subsections (B)(1) through (6) of this section shall be provided:
1. The original application form provided by the planning director shall be completed and signed by the applicant.
2. The requisite fees specified in Title 6 of the Clark County Code.
3. The following maps (as available from the department of community development through the "GIS development packet"):
a. General location map;
b. Elevation contours map;
c. Aerial photography mad [sic] (most recent year currently available through Clark County department of community development);
d. Aerial photography with contours;
e. Current zoning map;
f. Current comprehensive plan map;
g. Map of C-Tran bus routes, park and trails;
h. Water, sewer and storm systems map;
i. Soil type map;
j. Environmental constraints map; and
k. Quarter-section map.
4. The proposed plan, which shall clearly depict the following information:
a. General Information.
i. Applicant's name, mailing address, and phone number;
ii. Owner's name and mailing address;
iii. Contact person's name, address and phone number;
iv. North arrow (oriented to the top, left or right of the page), scale and date;
v. Proposed name of project;
vi. Vicinity map covering one-fourth mile radius from the development site; and
vii. Area of the site in acres or square feet.
b. Existing Conditions.
i. Environmental. On or within one hundred (100) feet of the site (as available from the department of community development through the "GIS development packet"):
(A) Topography (at two (2) foot contour intervals if available from a public source);
(B) Watercourses (streams, rivers, etc.);
(C) Areas within the designated one hundred (100) year floodplain;
(D) Water bodies and known wetlands;
(E) Any unstable slopes and landslide hazard areas;
(F) Significant wildlife habitat or vegetation; and
(G) Significant historic, cultural or archaeological resources.
ii. Land Use and Transportation.
(A) Layout of existing parcels drawn to scale;
(B) Location(s) of any existing building(s) on the site;
(C) Name and location of roadways and roadway easements (private and public) and surface material of these roads (e.g., gravel, asphalt or concrete pavement, etc.);
(D) Location of existing driveways and those driveways across the street to include distance between driveways and roadways (centerline to centerline);
(E) Location and width of existing pedestrian and bicycle facilities on and within one hundred (100) feet of the site; and
(F) Transit routes and stops within one-fourth mile of the development site.
c. Proposed Improvements.
i. Environmental (As Applicable). The applicant is encouraged, but not required, to show proposed mitigation measures for identified critical areas.
ii. Land Use and Transportation.
(A) Proposed easements;
(B) Location and width of road rights-of-way;
(C) Location and width of proposed roadways (e.g., curb to curb distance), provided by drawing or note;
(D) Location and width of off-site roads (including rights-of-way and roadways) which will provide access to the site;
(E) Location and width of proposed pedestrian and bicycle improvements other than those required by the road standards;
(F) Location and width or [sic] proposed easement for access, drainage, utilities, etc. (provided by drawing or note); and
(G) Proposed layout of structures, areas to be landscaped, and off-street parking and loading areas.
iii. A conceptual stormwater system layout which depicts the location of proposed stormwater facilities including stormwater lines, treatment facilities, and quantity control.
5. A completed draft State Environmental Policy Act (SEPA) checklist, if applicable.
6. A traffic information report containing the following information:
a. A specific description of the proposed land use or building use that is the basis for the estimate of the vehicle trip generation for the proposed development; and
b. A preliminary estimate of the vehicle trip generation for the proposed development including the numerical basis for the estimate (e.g., number of square feet, number of fueling pumps, etc.).
C. Information not provided on the form shall be provided on the face of the site plan, in an environmental checklist or on other attachments. The planning director may modify or waive requirements for pre-application materials and may conduct a pre-application review with less than all of the required information. However, failure to provide all of the required information may prevent the planning director from identifying all applicable issues of providing the most effective pre-application review and will preclude the application from the contingent vesting provisions of Section 18.600.055. (Sec. 2 Att. 2) of Ord. 1998-08-09)
[13] 18.404.060 Action by the hearings examiner.

The hearings examiner may approve, approve with conditions or disapprove the application for a conditional use permit subject to the Type III procedure in Chapter 18.600. In permitting a conditional use the hearings examiner may impose, in addition to regulations and standards expressly specified in this title, other conditions found necessary to protect the best interests of the surrounding property or neighborhood, or the county as a whole. These conditions may include requirements increasing the required lot size or yard dimensions, increasing street widths, controlling the location and number of vehicular access points to the property, increasing the number of off-street parking or loading spaces required, limiting the number of signs, limiting the coverage or height of buildings because of obstructions to view and reduction of light and air to adjacent property, limiting or prohibiting openings in sides of buildings or structures or requiring screening and landscaping where necessary to reduce noise and glare and maintain the property in a character in keeping with the surrounding area, and requirements under which any future enlargement or alteration of the use shall be reviewed by the county and new conditions imposed.
A. In order to grant any conditional use, the hearings examiner must find that the establishment, maintenance or operation of the use applied for will not, under the circumstances of the particular case, be significantly detrimental to the health, safety or general welfare of persons residing or working in the neighborhood of such proposed use or be detrimental or injurious to the property and improvements in the neighborhood or to the general welfare of the county.
[14] CCC 18.404.050, the provision concerning public hearings on conditional use permit applications, was repealed in 1997.
[15] Open Door improvidently waived its complaint that the $5,500 fee was a burden. CP at 349. Why it did this is unclear. Pastor Shanks of the church testified before the hearings examiner that Open Door is a small community that lives from offering to offering, with a monthly income of about $2,000. CP at 225. A permit application fee equal to two and a half months of the church's total income is certainly a burden. The Court of Appeals seemed to recognize that, devoting half of its analysis to the cost of the permit application and subjecting the permit fee to the compelling interest test, Open Door Baptist Church v. Clark County, No. 22285-0-II, slip op. at 4-5, 91 Wash.App. 1037, 1998 WL 341968 (Wash.Ct.App. June 26, 1998), although the Court of Appeals required Open Door to first "demonstrate an inability to pay the fee," id. at 7, before remission or waiver might be in order. Apparently the question of waiver is left in the hands of the same secular authorities who banned evening services rather than even a secular judiciary. Moreover the "inability to pay the fee" test potentially suggests a forced liquidation of church assets so as to eliminate any net worth available to pay tribute to the government before a waiver is appropriate.
[16] James Madison, Memorial and Remonstrance against Religious Assessments (June 20, 1785), reprinted in James Madison and the American Nation 1751-1836: An Encyclopedia 461 (Robert A. Rutland ed., 1994).
[17] The heavy-handed discretion hearings examiners may wield over churches is not merely hypothetical. Recently in Portland, a land-use hearings examiner revoked a conditional use permit allowing the Sunnyside Methodist Church to hold twice weekly coffee and meal hours for indigent persons and further conditioned church attendance in the 400-person sanctuary to a maximum of 70 for the church's Sunday and Wednesday services. Wade Nkruman & Paul Duchene, "Church's Supporters Meet to Protest Limits on Usage," The Oregonian, Feb. 14, 2000, at E1. This is precisely the sort of unbridled land-use official's discretion to which the majority's opinion opens the door here in Washington.
[18] The majority claims "under the decision of the Court of Appeals, Open Door is allowed to continue its operations unimpeded pending resolution of its conditional use permit application, given that the county failed to demonstrate a compelling state interest that would be offended by such interim operation." Majority at 42. However, one reads in vain the unpublished Court of Appeals opinion to discover the language which guarantees "unimpeded" operation of the church pending permit issuance, much less vacation in "practical effect" of the prohibition against Christmas Eve or Easter sunrise services. Cf. Majority at 42 n. 11. To the contrary, the Court of Appeals reversed the trial court's order which vacated the offensive administrative order as unconstitutional. Open Door Baptist Church v. Clark County, No. 22285-0-II, slip op. at 1, 91 Wash.App. 1037, 1998 WL 341968 (Wash.Ct.App. June 26, 1998). At most the Court of Appeals opined, "Furthermore, during the permit process, Open Door should be allowed to continue its use of the building because the county has failed to show what compelling interests of the county would be violated by Open Door's continued operation in the interim." Id. at 6-7 (emphasis added). Nowhere, however, does the Court of Appeals suggest "use of the building" means "unimpeded" use of the building. Such a result would require at least partial vacation of the administrative order, not its affirmance.
[19] I am frankly surprised the faithful would ever submit to this. In other lands, or at an earlier day in our own, believers have gone to the barricades for much less. History teaches liberty is not for the timid if it is to survive.
[20] This question is all the more pressing considering the three most recent cases where we upheld a church's free exercise rights in the face of an overreaching municipal land use scheme, First Covenant II, First United Methodist, and Munns. If anything, the landmark ordinance cases were less dramaticbecause churches per se were not explicitly singled out for adverse treatmentyet equally urgent instances of a clear infringement on religious liberty. What is unclear is the rationale underlying the sea change in article I, section 11, jurisprudence the majority's opinion announces.
[21] The majority contends "[r]esonant through the dissent's rhetoric is an animus not so much toward the zoning at issue here but toward zoning itself." Majority at 47. However the majority forgets that zoning laws, such as Clark County's, which arbitrarily restrict religious practice without regard to the three predicates of article I, section 11, are necessarily subject to constitutional animus, whereas this dissent, unlike the majority, draws a constitutional distinction between zoning laws which invade constitutionally protected civil liberties and those which pertain to "dog kennels," and the like. But see Majority at 46.
[22] Some claim the quotation is "apocryphal" (see Dale Gifford, The Conceptual Foundations of the Anglo-American Jurisprudence in Religion and Reason, 62 Tenn. L.Rev. 801 n. 201 (1995) (quoting RESPECTFULLY QUOTED: A Dictionary of Quotations Requested from the Congressional Research Service 147 (Suzy Platt ed., 1992))); yet, even if so, its truth is not thereby diminished.